UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

KELLIE BURLINGHAM,

          Plaintiff,

    v.

MICHAEL BROWN, ASHLEY ELLIOTT,
MATTHEW GARNER, DANIEL PERRINE,
AARON SCOTT, S WHITE and
CHRISTOPHER WYCHE, individuals,

          Defendants.

No.

COMPLAINT FOR DAMAGES

## I.    INTRODUCTION

1.1    On October 25, 2017, Bellevue Police Officers Matthew Garner and Christopher Wyche responded to a 9-1-1 call from a woman reporting that an ex-boyfriend Quentin had sent her a text with statements about wanting to commit suicide. They attempted to contact Quentin at his home in Bellevue, Washington, where he lived with his mother Plaintiff Kellie Burlingham and her husband, Marc Ramsey.  Mr. Ramsey opened the door, and Officer Garner asked to speak with Quentin.  Mr. Ramsey responded that Quentin was at work in Seattle and his mother was en route to pick him up.  Officer Garner then called Quentin, who is on the autism spectrum and in his early 20s, directly by cellphone.  Quentin told Officer Garner that he just had a bad day, that he did not wish to commit suicide, and that he did not need police assistance.

1.2    Despite learning that Quentin did not want to kill himself and was headed home safely with his mother, Officers Garner and Wyche, accompanied by Officer Ashley Elliott

COMPLAINT FOR DAMAGES - 1

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

returned to Ms. Burlingham's home just before midnight and spoke with Quentin at the front door.  Quentin repeated that he just had a bad day but was now fine and told the officers that he did not wish to be examined at the hospital.  The officers persisted, telling Quentin they had to take him to the hospital. Quentin told them that he needed to speak with his mother and started to close the door.  Officer Garner stuck his foot into the door threshold and entered the home followed by the other officers.  As he entered the home, he physically grabbed Quentin and followed him into the home where he pushed Quentin into a large chair and tried to restrain him.

1.3     Quentin's screaming and the commotion awoke his mother and stepfather.  They emerged from their bedroom and repeatedly told the officers to stop hurting Quentin, that he was on the autism spectrum, that they were making matter worse, and that they should leave.  Kellie and Marc went to retrieve their cellphones from the bedroom and announced they were going to record the officers.  Officers prevented Kellie and Marc from using their cellphones by tackling Kellie to the floor and handcuffing her, and by detaining and handcuffing Marc in the bedroom. The officers arrested Kellie and charged her with "obstruction," for which she was subsequently prosecuted. Several months later, the prosecutor dismissed the charges.

1.4     Quentin was ultimately handcuffed, taken into "protective custody" and involuntarily transported to Overlake Hospital to undergo a mental health evaluation. Quentin was examined by mental health professionals and released immediately with no finding that he was a danger to himself or others.

1.5     Plaintiff Kellie Burlingham brings this action seeking damages caused by the Officers' violations of her civil and constitutional rights.

## II.     PARTIES

2.1     Kellie Burlingham is a citizen of the State of Washington and a resident of King County and Bellevue, Washington.

2.2     Defendant Officer Michael Brown was, at all material times, a peace officer employed by the Bellevue Police Department, acting under color of law.

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

11564.01 mf200101

2.3     Defendant Officer Ashley Elliott was, at all material times, a peace officer employed by the Bellevue Police Department, acting under color of law.

2.4     Defendant Officer Matthew Garner was, at all material times, a peace officer employed by the Bellevue Police Department, acting under color of law.

2.5     Defendant Officer Daniel Perrine was, at all material times, a peace officer employed by the Bellevue Police Department, acting under color of law.

2.6     Defendant Officer Aaron Scott was, at all material times, a peace officer employed by the Bellevue Police Department, acting under color of law.

2.7     Defendant Officer S White was, at all material times, a peace officer employed by the Bellevue Police Department, acting under color of law.

2.8     Defendant Officer Christopher Wyche was, at all material times, a peace officer employed by the Bellevue Police Department, acting under color of law.

### III.     JURISDICTION AND VENUE

3.1     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

3.2     Venue is appropriate in the Western District of Washington pursuant to 28 U.S.C. § 1391 because at least some of the Defendants reside in this judicial district and because the events and omissions giving rise to the claims alleged here occurred within the Western District of Washington.

### IV.     FACTUAL ALLEGATIONS

4.1     On October 25, 2017, at approximately 9:30 pm, Claire Parsons called 9-1-1 to report that several minutes before her former boyfriend, Quentin Burlingham-Boutet ("Quentin"), had texted her that he wanted to kill himself.  Ms. Parsons provided the 911 dispatcher Quentin's home address in Bellevue, a home where he lived with his mother and stepfather, and his cellphone number.

4.2     Ms. Parsons read from the text aloud on the call: "I'm going to kill myself, and that is final.  I don't deserve to live. I'm doing you and everyone a favor just by dying. I don't

COMPLAINT FOR DAMAGES - 3

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

11564.01 mf200101

1    deserve to live."  When the dispatcher asked if there was any mention of how Quentin was going

2    to kill himself, Ms. Parsons replied: "No."

3         4.3    When the 9-1-1 dispatcher inquired whether Quentin had access to weapons in his

4    home, Ms. Parsons replied: "I don't know."  Ms. Parsons went on to say: "I think he has a gun.

5    But again I don't know.  He's mentioned it in passing, but not as a suicidal thing."  Ms. Parsons

6    told the dispatcher that Quentin had not described any plan to kill himself.

7         4.4    Ms. Parsons said she wasn't sure if Quentin was at home.  She also informed the

8    dispatcher that Quentin did not live alone, but lived at the address she provided with his mother

9    and stepfather.  When asked, Ms. Parsons gave the dispatcher Quentin's phone number and her

10   own phone number.

11        4.5    When asked, Ms. Parsons said Quentin had not made suicidal threats before.

12        4.6    Ms. Parsons informed dispatch that she had texted Quentin back: "Don't kill

13   yourself.  I'll call the police."  Ms. Parsons also conveyed to dispatch that she hadn't spoken to

14   Quentin for about a month, but had found out she had a sexually transmitted disease (STD) she

15   believed she had contracted from Quentin.  She also told dispatch that she had told Quentin she

16   now had a new boyfriend.

17        4.7    Between 9:31pm and 9:35pm, the 9-1-1 dispatcher relayed to the Bellevue Police

18   Department the following information:  Quentin's text to Ms. Parsons: "I'm going to kill myself

19   and that is final, I dont deserve to live"; that he had "no means"; that he was "now not

20   responding";  that "poss has gun in home but unk for sure and no mention of it today"; that

21   Quentin was 22 years old; and that he lived at his Bellevue home with his mother and stepfather;

22   among other information reported by Ms. Parsons.

23        4.8    At approximately 9:40pm, Bellevue Police Officers Matthew Garner and

24   Christopher Wyche made contact with Quentin's stepfather, Marc Ramsey, at the family home.

25   Officer Garner asked to speak with Quentin, but did not identify himself and provided no details

26   about why he wanted to speak with Quentin.  Marc responded that Quentin was at work in

27   Seattle and his mother was en route to pick him up.  Before the officers left, Marc asked for a

COMPLAINT FOR DAMAGES - 4

business card so that Quentin could follow up, and asked "What was this about?" Officer Garner replied "We want to talk to Quentin about suicide," then walked away.

4.9     The officers did not elaborate on the basis for their belief that Quentin was suicidal, ask Marc about any guns in the home, or mention that they needed to detain Quentin for a mental health evaluation.

4.10     After Officers Garner and Wyche left, Marc called Kellie to tell her that police officers were looking for Quentin to talk to him about suicide. Kellie told Marc that Quentin had an anxiety event earlier that evening, but that he had calmed down and was recovering.

4.11     At 9:50pm , Officer Garner advised dispatch that he had spoken with the stepfather and that the mother was picking up Quentin from work in Seattle.  Officer Garner also reported to dispatch that "step dad did not appear to be concerned."  In his later report, Officer Garner noted: "I provided [Marc] Ramsey with my business card and phone number to call me when [Quentin] Burlingham-Boutet returned home so I could speak with him about the suicidal statements."

4.12     After speaking with Marc, Officers Garner and Wyche waited for a call.  When he did not receive one, Officer Garner called Quentin on his cellphone shortly after 10 pm.  Quentin picked up the call while driving home with his mother.  In the case report, Officer Garner wrote that Quentin: "stated that he was with his mother and that he was fine," and that "he did not need the police and would be okay." While on the phone with Quentin, Officer Garner did not ask whether Quentin had access to a firearm.

4.13     At 10:37pm, dispatch reported that Officer Garner "talked with subj who said he was with his mother/said he was upset about the news of the STD and new boyfriend/said he is fine now and better/will wait for call from him when he returns home."

4.14     Despite learning from Quentin that he did not intend to kill himself and that he was now with his parents at home, Officers Garner, Wyche, and Ashley Elliott went back to Plaintiff's home at approximately 11:57pm.

COMPLAINT FOR DAMAGES - 5

4.15     Quentin was at home, dressed in his pajamas, and was talking to his current girlfriend on his cell phone when the officers knocked on the door.  Quentin answered the door, identified himself, and reiterated that he was okay. He again said he had had a bad day but did not mean what he sent in the text message.  The officers said they needed to have him evaluated at the hospital. The officers did not ask whether Quentin had a firearm in the house.

4.16     According to Officer Garner's case report, he "advised [Quentin] Burlingham-Boutet of his options to go to the hospital but that he needed to speak with a medical professional and that I could not leave with the knowledge that he may harm or kill himself."  According to Officer Elliott, Quentin said (again) that he just had a bad day, that he had talked to his mother about the situation, and smoked some marijuana to help with his anxiety.  When asked if he would voluntarily go to the hospital, Quentin said "no thank you." When the officers persisted and said he was going to have to go to the hospital, Quentin said he needed to speak with his mother. He said, "I'll be right back," and attempted to close the front door.

4.17     Officer Garner stuck his foot in the door threshold to prevent the door from closing.  Then Officer Garner, followed by Officers Wyche and Elliott, entered Plaintiff's home by pushing their way in without consent and without a warrant.

4.18     In the case report, Officer Garner described his justification for entering the home and seizing Quentin:

> Burlingham-Boutet appeared calm and coherent during my conversation with him. I advised him of the reason for the contact and that the statements he made had people concerned.  Burlingham-Boutet acknowledged that he had sent the text messages saying that he wanted to kill himself. He said that it had been a bad day but didn't mean what he had sent. I asked him if he had ever made suicidal statements previously and he said no. He also stated that he used to go the Youth Eastside Services for counseling and that he should probably go back for counseling due to his "seasonal affective disorder".

> Burlingham-Boutet stated that he was depressed, suffered from anxiety, had anger management issues for which he had previous counseling for. He had just recently smoked marijuana prior to our arrival at the house and there was information from his ex-girlfriend that he may have access to a firearm in the house. When asked if he had a plan on how he wanted to kill himself he said that he did not have a plan.

> Based on this information I believed Burlingham-Boutet was a danger to himself and needed be placed into protective custody.

COMPLAINT FOR DAMAGES - 6

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

11564.01 mf200101

4.19    Quentin backed up in a panic and, with his hands up, screamed that they didn't have a warrant and could not come in. Officers Garner, Elliott, and Wyche did not step back or explain why they were entering the home. Instead they repeated to Quentin that they were taking him to the hospital and pursued him inside. Officers Elliott Garner grabbed Quentin, ultimately tackling him on an armchair.  Officers Michael Brown, Daniel Perrine, and S White who had also been dispatched to the home, also entered without a warrant, and joined the other officers physically restraining Quentin.

4.20    Defendants did not have probable cause to seize Quentin under Washington's involuntary treatment statute, RCW 71.05, or otherwise.

4.21    Defendants did not have probable cause to believe that Quentin was engaged in criminal activity of any kind.

4.22    There were no exigent circumstances that justified Defendants' warrantless entry into Plaintiff's home, either in the officers' community caretaking function or otherwise.

4.23    The officers pushed Quentin into the armchair and attempted to physically restrain him.  Quentin began to panic and screamed that he hadn't done anything wrong and that the officers had no right to be in the home without a warrant.  He told the officers to get off him and that he was on the autism spectrum.  He also screamed for his mother (Kellie Burlingham) and stepfather (Marc Ramsey).

4.24    The loud commotion in the living room woke up Kellie and Marc who were asleep in their bedroom that adjoins the living room.  Kellie and Marc emerged from the bedroom and saw several officers forcibly restraining Quentin on an armchair in the living room.

4.25    As Kellie walked out of the bedroom, Officer Wyche told Kellie to "get back" and pushed her back behind a recliner and coffee table separating Kellie from the armchair where the officers had detained Quentin. Another officer told Kellie that they were taking Quentin to the hospital because of a 9-1-1 caller who said Quentin had sent suicidal text messages.  Kellie replied that that Quentin was not suicidal, that he had an anxiety attack earlier

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

11564.01 mf200101

but had since recovered, and that the officers should know Quentin had recovered because they called and talked to him on the phone earlier.

4.26   Kellie continued to plead with the officers to release Quentin and leave their home. She explained that Quentin was on the autism spectrum and that they were making the situation worse by hurting him.  The officers ignored her pleas, disregarded the information about Quentin's condition, and refused to leave Kellie's home.

4.27   Though Kellie remained in the area where Officer Wyche had initially corralled her, Officer Wyche continued yelling at Kellie to "Get back!"  Officer Wyche repeatedly pushed Kellie backwards by placing his hands on her chest and arms. Kellie did not move forward, or otherwise attempt to get closer to her son.  But she continued to tell the officers that they were hurting her son and making the situation worse.

4.28   When Kellie's attempts to reason with the officers went unanswered, she told the officers she was going to record them. She went into her bedroom and retrieved her cellphone to begin videoing the officers' mistreatment of her son.

4.29   Kellie returned to the area behind the recliner and coffee table. As she tapped her cellphone screen to turn on the video, Officer Aaron Scott leapt over the recliner, grabbed Kellie's right arm and tried to take her phone away.  Kellie kept hold of her cellphone, told Officer Scott to stop grabbing her arm and explained that her son Quentin was on the autism spectrum and should not be treated this way.

4.30   Officer Scott twisted Kellie's left arm behind her back, kept grabbing at the cellphone in her right arm, and threatened to arrest her for obstruction. Kellie refused to let go of her phone and Officer Scott said "that's it, I'm charging you with obstruction." Officer Scott managed to grab Kellie's phone, assisted by Officer Wyche, and threw it towards the kitchen floor, just a few feet away from the living room.

4.31   Marc, too, went to retrieve his cellphone so he could record the officers' mistreatment of Quentin.  Officer Elliott followed Marc into the bedroom and yelled "stop." Marc stopped immediately and complied with Officer Elliott's instruction and replied that he

COMPLAINT FOR DAMAGES - 8

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

was "just trying to get his cellphone" so he could video the officers' mistreating Quentin. Officer Elliott then grabbed Marc's upper arms and forced them behind his back. Officer Brown ran into the bedroom and grabbed Marc's right arm while Officer Elliott took hold of Marc's left arm and put Marc in handcuffs. Officer Perrine entered the bedroom and detained Marc as the other officers returned to the living room.

4.32     Meanwhile, Officers Scott and Wyche each held one of Kellie's arms and shoved her towards the side of the refrigerator, which was adjacent to the living room in the open floor plan. When Kellie shifted her weight to avoid hitting the side of the refrigerator, the officers threw her down on the kitchen floor where she landed on her knees first and then down on the left side of her head. Officer Scott then pushed Kellie down onto her stomach in front of the kitchen's butcher block cabinet, causing her to hit her head on the floor. Kellie cried out in pain, but the officers pushed her headfirst into the stove drawer.

4.33     The officers then handcuffed Kellie and used their body weight to push her against the floor, making it difficult for her to breathe. Kellie panicked and cried out that she couldn't breathe. Finally, the officers jerked her up into a standing position, still keeping her physically restrained.

4.34     Just as Officers Wyche and Scott pulled Kellie upright, Officers Brown and Garner dragged Quentin by the handcuffs outside to the patrol cars. Kellie tried to assure her son that everything would be ok. One of the officers told Kellie they were taking Quentin to Overlake Hospital whether Quentin wanted to go or not. Kellie then told the officers that this was not the correct way to treat someone on the autism spectrum.

4.35     Kellie continued to explain to the officers remaining in the home that her son was on the autism spectrum and taking him to the hospital was not the way to help him. Officer Scott told Kellie she was under arrest and began reciting the Miranda Rights.

4.36     Officers Scott and Wyche kept hold of Kellie, who was already handcuffed, while Officer Perrine kept Marc, also already handcuffed, detained in their bedroom. Other Bellevue Police Department officers walked throughout the home.

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

11564.01 mf200101

4.37    The officers' supervisor, Sergeant Ramos, arrived at the home and spoke with Officers Scott and Wyche outside. Sergeant Ramos came back inside the home and asked Kellie if she understood what happened and why the officers were at her home. Kellie said she did not understand at all because when the officers initially spoke with Quentin, he was calm and obviously not suicidal.

4.38    After Sergeant Ramos spoke with Kellie, other officers removed Kellie and Marc's handcuffs and left the home.

4.39    Defendants took Quentin involuntarily to Overlake Hospital where he was examined by a nurse and psychiatrist.  These medical professionals determined that there was no reason to hold Quentin and he was released from "protective custody" at approximately 3:00 am.

4.40    On December 6, 2017 Kellie was charged with Obstructing a Law Enforcement Officer. Kellie expended money to hire an attorney to defend this charge, referred to the Bellevue City Prosecutor by Deputy Scott. Six months later, the charge was dismissed.

4.41    Officers Scott and Wyche caused Kellie Burlingham physical injury and pain, extreme emotional distress and mental harm as a result of the unconstitutional conduct.

4.42    Officers Scott and Wyche seized Kellie when they manhandled, handcuffed, and arrested her.

4.43    At no point did Kellie pose a threat to the safety of Defendants. Kellie did not make any verbal threats and was not physically violent.

4.44    At no point did Kellie act in an unlawful manner.

4.45    Officer Scott interfered with Kellie's right to free speech when he retaliated against her for rightfully exercising her right to record officers in the performance of their official duties.

4.46    Officer Scott interfered with Kellie's right to free speech when he retaliated against her and punished her for criticizing the Defendants.

4.47    Officers Scott and Wyche violated Kellie's clearly established constitutional rights when they arrested and subdued her, in violation of the First and Fourth Amendments.

COMPLAINT FOR DAMAGES - 10

4.33    Defendants had a duty of care in investigating Quentin's purported need for mental health treatment and basis for subjecting him to an involuntarily evaluation. Defendants recklessly and unreasonably breached that duty by entering Ms. Burlingham's home, handcuffing and detaining Quentin, and taking him into protective custody, despite explanations from both Quentin and Kellie that such measures would be counterproductive to Quentin's mental health.

4.48    As a proximate result of Defendants' wrongful actions against Quentin, Kellie suffered outrage, anxiety, trauma, injury, and severe emotional distress.

4.49    Defendant Officers' actions were negligent, reckless, outrageous, and deliberately indifferent to Kellie's rights.

4.38    Plaintiff Kellie Burlingham is entitled to special and general damages caused by Defendants.

## V.    CLAIMS

### (Federal Civil Rights Violations Under 42 U.S.C. § 1983)

5.1    By their acts and omissions described above, Defendants are liable for compensatory and punitive damages for deprivation of Kellie Burlingham's Fourth Amendment right to be free from unreasonable seizures, including by use of excessive force, warrantless entry into her home, and arrest and detention without probable or legal cause.

5.2    By their acts and omissions described above, Defendants are liable for compensatory and punitive damages for deprivation of Kellie Burlingham's First Amendment rights, including to voice criticism of the police, to record Defendants in the performance of their official duties, and to be free from retaliation for engaging in protected activities.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

6.1    A declaration that Defendants' actions violated Plaintiff's civil rights;

6.2    Damages for physical harm and pain and suffering;

6.3    Damages for emotional distress and harm;

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

11564.01 mf200101

6.4     Damages for past and future medical care;

6.5     Damages for lost wages;

6.6     Punitive damages against the individual Defendants;

6.7     Pre-judgment and post-judgment interest on any amounts awarded;

6.8     Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law;

6.9     Other declaratory and injunctive relief as the Court deems just and equitable;

6.10    The right to conform the pleadings to the evidence presented.


DATED this 17th day of April, 2020.

                                  MacDONALD HOAGUE & BAYLESS


                                  By: _____
                                      Joe Shaeffer, WSBA #33273
                                      joe@mhb.com



                                      _/s/ Mika Rothman_____
                                      Mika Rothman, WSBA # 55870
                                      mikar@mhb.com
                                      705 Second Avenue, Suite 1500
                                      Seattle, WA 98104
                                      *Attorneys for Plaintiff*


COMPLAINT FOR DAMAGES - 12

11564.01 mf200101